**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BanxCorp**,**<br><br>        Plaintiff,<br><br>            v.<br><br>Apax Partners L.P., Apax Partners LLP,<br>BEN Merger Sub, Inc., BEN Holdings, Inc.,<br>Apax US VII, L.P. , and Apax Partners<br>Europe Managers Limited**,**<br><br>        Defendants | Civil Action No.<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, BanxCorp a/k/a BanxQuote ("BANXCORP", "BanxQuote," "*BanxQuote.com*" or Plaintiff), by and through its attorneys, CANTER LAW FIRM P.C., files this Complaint against Apax Partners L.P., Apax Partners LLP, BEN Merger Sub, Inc. ("BEN Merger Sub"), BEN Holdings, Inc. ("BEN Holdings"), Apax US VII, L.P. and Apax Partners Europe Managers Limited (collectively referred to as "Defendants", "Apax" or "Apax Partners", unless the context indicates otherwise), for antitrust violations pursuant to Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. § 1 and 2), Section 7 of the Clayton Act 15 U.S.C. § 18, including treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and under equivalent state statutes, including the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-1 et seq., stating as follows:

## PARTIES

1.      Plaintiff BANXCORP is a Delaware corporation, with a place of business at 153 S. Morris Lane, Scarsdale, New York.

2.      Defendant Apax Partners, L.P. is a Delaware limited partnership with its principal office at 601 Lexington Avenue, 53rd Floor, New York, New York.

3.      Defendant Apax Partners LLP is a limited liability partnership governed under English law with a registered office at 33 Jermyn Street, London, United Kingdom.

4.      Defendant BEN Merger Sub, Inc. is a Florida corporation with its principal office at 601 Lexington Avenue, 53rd Floor, New York, New York.

5.      Defendant BEN Holdings, Inc. is a Delaware corporation with its principal office at 601 Lexington Avenue, 53rd Floor, New York, New York.

6.      Defendant Apax US VII, L.P. is a Delaware limited partnership with its principal office at 601 Lexington Avenue, 53rd Floor, New York, New York.

7.      Defendant Apax Partners Europe Managers Limited governed under English law is located at 33 Jermyn Street, London, United Kingdom.

## JURISDICTION AND VENUE

8.      The jurisdiction of this Court is invoked pursuant to 15 U.S.C. § 1, § 26 and 28 U.S.C. § 1331, § 1337, and § 1367.

9.      This Court has proper venue pursuant to 28 U.S.C. § 1391 (b) and (c) and 15 U.S.C. §§ 15 and 22 because Defendants have transacted a substantial amount of

business in the state, a substantial part of the property that is the subject of this action is situated in this District, the conduct complained of herein occurred in part in the state, and harm caused by the anticompetitive conduct has occurred within the state.

## PRELIMINARY STATEMENT

10.     Upon information and belief, on or about July 22, 2009, Defendants entered into a contract, combination or conspiracy in restraint of trade to achieve monopoly power in the market for Bank Rate Websites throughout the United States, as defined under the Relevant Market section below, by acquiring and operating Bankrate Inc. ("BANKRATE"), which itself has achieved monopoly power in the relevant market with a market share in excess of 95%.

11.     BANKRATE's own conduct in restraint of trade, including coordinated conduct and price-fixing with competitors, division of markets and allocation of customers, traffic and revenues with competitors in violation of Section 1 of the Sherman Act, monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, and prohibited acquisition of competitors in violation of Section 7 of the Clayton Act, and the equivalent statutes under the New Jersey Antitrust Act, is set forth in more detail in the related action captioned *BanxCorp v. Bankrate*, Inc., Civ. No. 07-3398 (SDW)(MCA) (D.N.J. July 13, 2010) (the "Bankrate Action") and is specifically incorporated herein by reference as if set forth in full.

12.     Plaintiff repeats the allegations contained in the Third Amended Complaint in the Bankrate Action's including the Appendix attached thereto, with the same force and effect as if the same had been more fully set forth herein.

13.     Upon information and belief, BANKRATE, through its websites at *Bankrate.com*, *Interest.com* and *Bankaholic.com*, together with approximately 100 other horizontal competitors, formed a cartel to fix prices, divide markets, and allocate customers, traffic and revenues between each other in the relevant market (the "CARTEL"), as set forth in the related action captioned *BanxCorp v. LendingTree LLC, et al.*, Civ. No. 10-02467 (SDW)(MCA) (D.N.J. 2010) (the "LendingTree Action") and is specifically incorporated herein by reference as if set forth in full.

14.     All the judicial proceedings, Court Opinions. pleadings, briefs and exhibits in the LendingTree Action are expressly incorporated herein by reference. Plaintiff repeats the allegations contained in the First Amended Complaint in the LendingTree Action, with the same force and effect as if the same had been more fully set forth herein

15.     Upon information and belief, the entities that have been or currently are members of the CARTEL are listed in Tables 1 and 2 of Exhibit A annexed hereto, as publicly stated on BANKRATE's website.

16.     Upon information and belief, Defendants have combined and conspired to monopolize the market for Bank Rate Websites throughout the United States, as defined under the Relevant Market section below, with the purpose to injure, destroy, or prevent competition.

17.    Upon information and belief, Defendants had the power and intent to monopolize the market for Bank Rate Websites. Furthermore, upon information and belief, BANKRATE possesses monopoly power in the relevant market, to control and fix prices and exclude competition.

18.    Defendants willfully acquired and maintained such power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

19.    Upon information and belief, Defendants' acquisition of BANKRATE further perpetuated BANKRATE's monopoly power in the relevant market, raised barriers to entry, and substantially lessened competition.

20.    Upon information and belief, by intentional decision and actions, Defendants have achieved an unregulated, impermissible, and illegal concentration of control over the market for Bank Rate Websites.

21.    The purpose and effect of the Defendants' and BANKRATE's dominance, modus operandi and unlawful scheme was to restrain the competitive field in the market or submarket for Bank Rate Websites through predatory and exclusionary practices as more fully set forth below, thereby coercing customers – the banks – to purchase Bank Rate Website listings on a cost-per-click ("CPC") basis from BANKRATE and other members of the CARTEL instead of from Plaintiff and/or other independent competitors.

22.     These unequal positions have caused and continue to cause extensive damage to Plaintiff, the competitive marketplace, to customers – the financial service providers, and ultimately to consumers – the end users.

23.     Upon information and belief, the damage caused by the Defendants to Plaintiff exceeds $500 million, and the harm to the competitive marketplace and consumers is of equal or greater magnitude.

### THE ANTICOMPETITIVE MERGER BETWEEN APAX AND BANKRATE

24.     Upon information and belief, Apax Partners, a $35 billion global private equity conglomerate operating in nine countries across three continents and whose core business sectors include media and financial services, easily recognized the challenges that it would have faced if it attempted to penetrate on its own the U.S. market for Bank Rate Websites, due to the monopoly and elaborate barriers to entry erected by BANKRATE over the past decade. Instead, Apax decided to enter the market more rapidly by acquiring BANKRATE's illegal price-fixing monopoly outright, as more fully set forth below.

25.     Pursuant to their Agreement and Plan of Merger dated July 22, 2009, (the "Merger Agreement"), BANKRATE was acquired by Apax Partners, acting in concert with and through the support of BANKRATE's insider shareholders prior to the Merger ("Bankrate's Insiders") [1], who in turn became partners of Apax, in a transaction valued

---

[1] Apax Partners and the Bankrate Insiders entered into a number of transactions between each other as more fully set forth below. Approximately 24% of the outstanding shares of BANKRATE prior to the Merger were owned by Bankrate's

at approximately $571 million, thereby exacerbating and entrenching BANKRATE's monopoly and market power and its exclusionary and predatory price-fixing CARTEL.

**A.      Defendants' International Cartel**

26.     Upon information and belief, Defendants have implemented an overarching scheme to illegally leverage BANKRATE's and the CARTEL's monopoly and market dominance to gain an unfair advantage over Plaintiff and the few remaining independent competitors in the market or submarket for Bank Rate Websites, further discouraging competition.

27.     Upon information and belief, Defendants' contracts, combination and conspiracy joined together separate economic actors and decision makers pursuing separate economic interests in the form of an International Cartel as set forth below, with the effect of reducing or eliminating any potential independent competition in the relevant market.

28.     According to BANKRATE's S.E.C. Schedule 14D-9, Amendment No. 4, filed on August 24, 2009 ("Schedule 14D-9"), BEN Merger Sub is a wholly owned subsidiary of BEN Holdings, an indirect wholly owned subsidiary of Ben Holding S.à.r.l., which is beneficially owned by Apax US VII, L.P. ("Apax US VII Fund"), Apax Europe VII-A, L.P., Apax Europe VII-B, L.P. and Apax Europe VII-1, L.P. ("Apax

---

Insiders – including its officers and certain directors and beneficial owners of more than 10% of its common stock – who *in their capacity as shareholders* entered into Non-Tender and Support Agreements with Apax. *See* BANKRATE's S.E.C. Insider Report. *See also* BANKRATE's S.E.C. Form SC TO-T, Ex-99.A.5.5, filed on August 27, 2009. Plaintiff reserves the right to join as defendants any and all of the Bankrate Insiders or other entities and individuals affiliated therewith.

Europe VII Funds"); Apax Partners, L.P. is (i) an advisor to Apax US VII Fund, and (ii) an advisor to Apax Partners LLP, which is an advisor to Apax Partners Europe Managers Limited, the discretionary investment manager to the Apax Europe VII Funds. (all of the above collectively, the "International Cartel") [2]

29.    As a result of Defendants' International Cartel concerted conduct in restraint of trade, and their knowing participation and acquiescence in BANKRATE's illegal anticompetitive scheme, Defendants and their International Cartel are jointly and severally liable.

**B.    Privity Between Apax Partners and BANKRATE**

30.    According to Schedule 14D-9 under Item 2(b), Apax Partners merged with and into BANKRATE through its BEN Merger Sub, with BANKRATE continuing as the surviving corporation and a wholly owned subsidiary of BEN Holdings.

31.    Consequently, as a result of the transaction there is privity between Apax Partners and BANKRATE.  Therefore, as a result of Defendants' concerted conduct in restraint of trade, and their knowing participation and acquiescence in BANKRATE's

---

[2] Plaintiff reserves the right to join as defendants other entities and individuals affiliated with Apax Partners. Upon information and belief, Ben Holding S.à.r.l. is a limited liability company organized under Luxembourg law, with a registered office at 41 boulevard du Prince Henri, L-1724 Luxembourg. Apax Europe VII-A, L.P., Apax Europe VII-B, L.P., Apax Europe VII-1, L.P., Apax US VII GP, L.P., Apax Europe VII GP L.P. Inc., and Apax Europe VII GP Co. Limited have a registered office at Royal Bank Place, 1 Glategny Esplanade, Third Floor, St. Peter Port, Guernsey. Apax US VII GP, Ltd. is governed by the laws of Cayman Islands, with a registered office at Walkers House, P.O. Box 908GT, George Town, Grand Cayman.

illegal anticompetitive scheme, Defendants and BANKRATE are jointly and severally liable.

**C.     Collusion Between Apax Partners and Bankrate Insiders**

32.     In order to induce or influence the conduct of the Bankrate Insiders, Apax offered them certain sweetheart deals[3] and cash payouts, so as to ensure their support in acquiring BANKRATE's monopoly, giving Apax the inherent ability to fix prices in the relevant market throughout the United States by gaining control of BANKRATE's CARTEL.

33.     According to Schedule 14D-9 under Item 3(a), upon completion of the Merger, the BANKRATE officers Thomas R. Evans ("Evans"), Edward J. DiMaria ("DiMaria"), Daniel P. Hoogterp, Steven L. Horowitz, Donaldson M. Ross, Michael J. Ricciardelli, Bruce J. Zanca and Robert J. DeFranco, and the BANKRATE directors Peter C. Morse[4], Robert O'Block, William C. Martin, Richard J. Pinola and Randall E. Poliner received cash payments from Apax in excess of $23 million in the aggregate with

---

[3] According to *The American Heritage Dictionary of Business Terms* published by Houghton Mifflin Harcourt Publishing Company (2010), a sweetheart deal is defined as a "collusive, unethical transaction between two parties."

[4] According to Schedule 14D-9 under Item 3(d), as a portion of Mr. Morse's shares were held in trust or by family members, including his wife Martha Ford Morse (an heiress to the Ford auto empire and the Firestone tire dynasty), the Martha F. Morse Revocable Trust, the Peter C. Morse 2008 Annuity Trust, the Peter C. Morse 2007 Annuity Trust, the Peter C. Morse Remainder Trust FBO Clay P. Morse, the Peter C. Morse Remainder Trust FBO Kate M. Frantz, and the Peter C. Morse Remainder Trust FBO Lisa D. Morse, such persons were also parties and co-signatories to Mr. Morse's special agreement with Apax with respect to their respective shares.

respect to their BANKRATE options, and in excess of $131 million in the aggregate with respect to their BANKRATE shares.

34.     In addition, Messrs. Evans, DiMaria, Hoogterp, Horowitz, Ross, Ricciardelli, Zanca and DeFranco received cash payments from Apax of $7 million in the aggregate with respect to their restricted BANKRATE shares.

35.     According to BANKRATE's S.E.C. Form SC TO-T, Ex-99.A.5.5 and A.5.6, filed on August 27, 2009, Apax Partners publicly announced the successful completion of its cash tender offer for all of the outstanding shares of common stock of BANKRATE on August, 25, 2009. According to the announcement, BEN Merger Sub exercised its "top-up" option granted under the Merger Agreement pursuant to which BANKRATE issued shares to BEN Merger Sub in an amount sufficient to achieve at least 80% ownership plus one share and permit the completion of a "short-form" merger, without a vote of BANKRATE's *minority* shareholders.

36.     According to BANKRATE's S.E.C. Form 8-K filed on August 27, 2009[5], upon the change in control, six appointees of Apax – Harpreet Anand, Seth Brody, Philipp Gusinde, Sean Fernandes, Christian Stahl, and Mitch Truwit were added to BANKRATE's board of directors. According to other S.E.C. filings, the officers of BANKRATE, Messrs. Evans, DiMaria, Hoogterp, Horowitz, Ross, Ricciardelli, Zanca and DeFranco, remained the same as prior to the transaction.

---

[5] http://sec.gov/Archives/edgar/data/1080866/000089882209000418/bankrate8k.htm.

**D.      The Contracts, Combination and Conspiracy
            Between Apax Partners and BANKRATE**

37.     From BANKRATE's perspective, as described in Schedule 14D-9 under Item 3(c), among other reasons, the Merger Agreement was driven by the following factors:

   a.   The financial strength of Apax;

   b.   BANKRATE's ability to raise additional equity capital and exploit opportunities for *continued acquisitions of competitors or potential competitors*; and

   c.   The *significance of acquisition activity* to BANKRATE's future growth plans and their assessment of *the prospects of BANKRATE on a standalone basis relative to potential competitors*.

38.     From the perspective of Apax Partners, rather than attempting to enter the relevant market on its own, the transaction provided a rapid entry into the market through the acquisition and enhancement of a powerful monopoly with the ability to control and fix prices, dividing markets and allocating customers, traffic and revenues in coordinated interaction with competitors nationwide, thus further raising barriers to entry and destroying or discouraging any potential independent competition.

**E.      Background of the Transaction**

39.     According to Schedule 14D-9 under Item 4(b), beginning in June 2007, in response to inbound inquiries, BANKRATE, with the help of financial and legal advisors, conducted a thorough review of strategic alternatives for BANKRATE.

40.     In mid-2008, again in response to inbound inquiries, BANKRATE re-initiated its review of strategic alternatives, reengaging in discussions with potential acquirers. During this time, BANKRATE began a dialogue with Apax, discussing potential partnerships regarding potential acquisitions, as well as the possibility of Apax purchasing BANKRATE.

41.     In September 2008, representatives of Apax met with BANKRATE's management at BANKRATE's headquarters and BANKRATE's management also visited Defendant Apax Partners LLP's offices in London to provide an overview of the business to representatives of the Apax International Cartel.

42.     On or about April 29, 2009 BANKRATE again reviewed its strategic position and in order to compete even more aggressively in the marketplace and maintain its monopoly and market position, BANKRATE wanted to acquire strategic assets over the coming months and years.

43.     On or about June 5, 2009, BANKRATE and Apax entered into a confidentiality agreement. BANKRATE and its advisors began collecting documents for the creation of a data room for due diligence purposes, and Apax began engaging in due diligence activities.

44.     After continued discussions, on June 23, 2009, Apax increased its offer to acquire all of BANKRATE's outstanding shares in cash with no requirement for third party debt financing.

45.     At a special meeting held on or about June 30, 2009, BANKRATE reviewed Apax's acquisition proposal and continued discussions and negotiations with

Apax concerning the transaction. BANKRATE also entered into an exclusivity agreement with Apax with regard to exclusive negotiations until July 20, 2009.

46.     During the end of June and the first two weeks of July 2009 Apax continued with its diligence efforts. During the second week of July 2009 and over the following week, the parties negotiated the terms of the Merger Agreement and related documentation.

47.     On or about July 22, 2009, BANKRATE's board of directors met to consider the proposed Apax transaction. After discussion regarding the terms of the transaction, BANKRATE resolved to approve the Merger Agreement and related transactions. Apax and BANKRATE then finalized and executed the transaction documents, and issued a joint press release announcing the transaction.

## RELEVANT MARKET

48.     The relevant product market or submarket for purposes of this Complaint is the market for fee-based aggregated bank rate table listings with interactive functionalities on the Internet, often referred to as bank rate websites ("Bank Rate Websites"). [6]

49.     The relevant geographic market for Bank Rate Websites is the whole of the United States.

---

[6] The relevant market for Bank Rate Websites is also referred to by Defendant in its periodic public declarations as the "Internet-based consumer banking marketplace," as set forth in more detail below.

**A.**     **Peculiar Characteristics and Functional Attributes of Bank Rate Websites**

50.     **Customers or Direct Purchasers.**  The customers of Bank Rate Websites, also referred to as direct purchasers, are financial service providers (banks, mortgage brokers and lenders), who purchase hyperlinked rate listings for banking and lending products (i.e. money market accounts, CDs, mortgage loans, home equity loans, and automobile loans), in order to connect interactively with "in-market" consumers. Ultimately the financial service providers sell their banking and lending products to these "in-market" consumers who clicked on the CPC rate listings.

51.     **End Users or Indirect Purchasers.**  The end users of Bank Rate Websites, also referred to as indirect purchasers, are "in-market" consumers who shop and click for banking and lending rates and products.  There is a causal connection between the consumers who click on the listed bank rates and the CPC paid by the customers, i.e., the banks. The direct and indirect purchasers are therefore inextricably intertwined.

52.     **Distinct Prices.** CPC or Cost-Per-Click is a fee paid by customers, i.e., the financial service providers, to list their rates on a Bank Rate Website.

53.     CPC transactions are charged every time a consumer clicks on a hyperlinked rate listing at a Bank Rate Website.

54.     **Products Being Sold.**

    a. The products being sold by Bank Rate Websites to financial service providers are CPC rate table listings, also referred to as Hyperlink CPC rate listings. Financial service providers purchase these products at Bank Rate Websites in order to connect with consumers.

14

b. In turn, after purchasing CPC rate listings, the financial service providers sell banking and lending products to consumers who shop and click on the rates listed by Bank Rate Websites.

55. **Typical Transaction Cycle.** Set forth below and in Figure 1 of Exhibit A, is a simplified step-by-step description of the typical transaction cycle and value-added chain of related activities that take place at Bank Rate Websites:

**Step 1**: **Banks Purchase Rate Listings at a Bank Rate Website.** "Imaginary Bank," a hypothetical financial services provider, signs a purchase order ("P.O.") to list, e.g., its high yield CD (certificate of deposit) rates at a Bank Rate Website, called for example XYZ.com.  The P.O. specifies the contract term, e.g., one year; the CPC price, e.g., $7.00 per click; the product being listed, e.g., CDs; the geographic location where the rate listings are to be shown, e.g., all 50 states and Washington D.C.; the CPC traffic reporting details, i.e., monthly click reports; and the billing and payment details.

**Step 2: The Bank Rate Website Lists the Rates.** The Bank Rate Website XYZ.com sets up the listing of the Imaginary Bank rates together with thousands of other competitive bank rates within its website, and the Imaginary Bank starts to update its own rates 24x7 on the Bank Rate Website.

**Step 3**: **Consumers Shop and Click for Rates at Bank Rate Websites**. Millions of "in-market" consumers shopping for banking and lending

products visit XYZ.com, where they can find the Imaginary Bank CD rates, compare them with other rates and products, and instantly connect with the Imaginary Bank by clicking on its rate listings.

**Step 4**: **Consumers Buy Banking and Lending Products.** Tens or hundreds of thousands of consumers who visit the XYZ.com Bank Rate Website start transacting and buying CDs from the Imaginary Bank.

56.     **Commercial Realities of Bank Rate Websites.**   Bank Rate Websites combine certain functional attributes that are inextricably intertwined:   they sell advertising to customers—in the form of CPC-based bank rate listings sold to banks and financial institutions—while at the same time they provide a marketplace site that has leveraged the Internet to improve and transform the consumer shopping experience.

57.     For example, as shown in Exhibit B annexed hereto, BANKRATE's own 2003 Corporate Profile states as follows:

> Bankrate facilitates transactions between buyers and sellers by listing current rates, and telephone numbers for financial institutions -- some of which are hyperlinked through an advertising arrangement.

58.     BANKRATE's Corporate Profile further states that the independent research firm Forrester Research points to *Bankrate.com* as "an example of a marketplace site that has used the Internet to improve and transform the consumer shopping experience."

59.     **One-Stop-Shopping and Selling Experience.** Bank Rate Websites indeed offer a unique one-stop-shopping and selling experience. This one-stop-shopping and

selling experience allows financial service providers to interactively connect with "in-market" consumers that wish to easily compare and shop from a wide variety of clustered consumer banking and lending products (money market accounts, CDs, mortgage loans, home equity loans, and automobile loans) from multiple financial service providers. [7]

60.     The one-stop-shopping and selling experience is conceptually similar to one-stop-shopping supermarkets, office superstores and department stores. Financial service providers and consumers do not sell or buy a Bank Rate Website, just as vendors and shoppers do not sell or buy a supermarket, office superstore, or department store; instead, financial service providers and consumers can only sell or buy the products offered within a Bank Rate Website.

61.     **Distinct Functional Attributes.** Bank Rate Websites are characterized by certain typical functional attributes as set forth below and in Table 3 of the annexed Exhibit A:

    a.   Internet-based presence through a website location.[8]

    b.   Hyperlink CPC rate listings sold to third-party financial service providers.[9]

---

[7] Without Bank Rate Websites, no individual consumer can reasonably be expected to quickly and reliably shop on his or her own, and instantly find the most competitive deposit and loan rates locally or nationally, considering that according to the U.S. Census Bureau 2005 Statistics of U.S. Businesses, there were 6,933 commercial banks, 1,366 savings institutions, 8,080 credit unions, 20,686 mortgage and non-mortgage loan brokerage firms, 10,670 mortgage banks and 4,779 consumer lenders.

[8] Rate tables published in traditional media are not included in this relevant market.

    c.  One-stop-shopping and selling experience.

    d.  Aggregated rate tables[10] with side by side 24x7 real-time rate quotes for banking and lending products from multiple third-party financial service providers.

    e.  Interactive functionality allows "in-market" consumers to click on rates and be instantly connected to a financial service provider.

    f.  Product variety: Rate listings for money market accounts, CDs, mortgages, home equity, and auto loans.

    g.  Depth and breadth of inventory.

    h.  Dynamic sorting and selection ability.

    i.  State by state segmentation and comparison to national, regional and local average benchmarks.

    j.  Ease and speed of use.

    k.  E-commerce technology and high-speed communications.

    l.  Online database with computerized input and output.

    m.  Additional Features: Analytical tools such as charts and editorial market reports.

62.    **Distinct Look and Feel.** Bank Rate Websites have a distinct look and feel, as shown in Exhibit C annexed hereto.

---

[9] Individual stand-alone bank websites listing their own in-house rate table are not included in this relevant market.

[10] Bank Rate Websites display rate tables for the same reason as stock or commodity prices are displayed in tabular form at an electronic stock or commodities exchange: to indicate the prevailing rates or prices in the respective marketplace at any given time.

**B.      Industry Recognition of Bank Rate Websites as a Distinct Market**

63.      BANKRATE's periodic declarations, press releases, sales materials, investor presentations, and filings with the United States Securities and Exchange Commission ("S.E.C."), as well as independent media, stock underwriters, analysts, industry experts, and individual and institutional investors, confirm and recognize the market for Bank Rate Websites as a distinct market.

64.      For example, BANKRATE's S.E.C. Form 10-K Annual Reports filed between 2001 and 2007 state that "Bankrate, Inc. owns and operates *Bankrate.com*, *an Internet-based consumer banking marketplace*." See Exhibit D annexed hereto.

65.      Similarly, BANKRATE's Registration Statement on Form S-3 filed with the S.E.C. on April 25, 2006, involving a common stock Offering Prospectus, underwritten by Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc. Jefferies & Company, Inc., Canaccord Adams Inc., Needham & Company, LLC and ThinkEquity Partners LLC, has the same recognition of the relevant market on top of page S-1.

66.      BANKRATE's 2003 Corporate Profile under Business Overview, provides that "Bankrate's business model has enabled it to become *the Internet's leading consumer banking marketplace*..." See Exhibit B annexed hereto.

67.      BANKRATE's Corporate Profile further states that the independent research company Forrester Research points to *Bankrate.com* as "an example of a marketplace site that has used the Internet to improve and transform the consumer shopping experience."

68.     As a further example, in their respective March 12, 2007 partnership announcements concerning their "new marketplace dedicated to connecting consumers to high-yield savings accounts," both LendingTree and BANKRATE also described the business of BANKRATE as an *Internet consumer banking marketplace*. See Exhibit E annexed hereto.

## C.     Outer Boundaries of the Relevant Market

69.     The outer boundaries of the relevant market in this case are determined by the limited and rapidly declining interchangeability of use and cross-elasticity of demand between Bank Rate Websites and substitutes for it, as further outlined below.

70.     Bank Rate Website customers enjoy a greater efficiency and less waste in reaching and converting consumer banking clients in comparison to other websites, including personal finance related sites, search or other sites and traditional media, such as direct mail, print or broadcast media.   This fact has been recognized by BANKRATE in its Investor Relations website:

> Because Bankrate visitors are "in-market" or "ready-to-buy" consumers, our advertisers enjoy a greater efficiency (less waste) in reaching and converting clients as compared to other advertising sites and mediums. *Other Web sites and advertising mediums*, such as *direct mail* or *broadcast media*, must serve exponentially more advertising impressions to get anywhere near the conversion yields experienced by Bankrate advertisers.[11]

---

[11] http://phx.corporate-ir.net/phoenix.zhtml?c=61502&p=irol-homeProfile (last viewed on September 16, 2009)

71.    The absence of viable, equivalent alternative substitutes for Bank Rate Websites, and therefore the inelastic nature of the relevant market has been acknowledged by BANKRATE in its periodic S.E.C. filings, as follows:

> It is our belief that many of these products and services are not well explained, and *viable, equivalent alternatives typically are not presented when marketed to consumers through traditional media*. As the marketing of many of these products and services moves to the Internet, consumers seek new sources of independent objective information such as *Bankrate.com* to facilitate and support their buying decisions. The interactive nature of the Internet allows us to display extensive research on financial products and services previously unavailable to consumers. [12]

72.    Such inelasticity of the relevant market is further evidenced by BANKRATE's Chief Financial Officer DiMaria in its Q4-08 Earnings Call, wherein the Bankrate Print business has steadily declined:

> As most of you are aware, the print business has been on a downward trajectory in terms of sales for 2008 and most of 2007. Although we continue to realize great benefits from this business as a feeder of online traffic, the margins are slim as a standalone business, and no longer support the carrying value of the print intangible assets on our books.

73.    As readers and advertisers continue to migrate to the Web, newspapers, for example, have started to contract by reducing their size and jettisoning mainstays such as financial tables. Some of the nation's top dailies have already trimmed their size and transferred content to the Web, or plan to do so in the near future. According to The New Yorker, "[f]ew believe that newspapers in their current printed form will survive.

---

[12] BANKRATE's S.E.C. Form 10-K for 2008, under Part I, Item 1. Business (at 7), Our Opportunity.

Newspaper companies are losing advertisers, readers, market value, and, in some cases, their sense of mission at a pace that would have been barely imaginable just four years ago." [13]

74.     The decline of traditional media has been so widely and frequently reported around the world, that a website at http://dialect.ca/traditional-publishing-rip/archive has made available a collection of headlines documenting the demise, entitled *Traditional Media, REST IN PEACE.*

75.     Empirical evidence during the past decade has shown that Bank Rate Websites have been able to take away significant amounts of business at a growing pace from these other products, sites and media.

76.     A research study released by HSBC Direct on March 12, 2009, showed that 62 percent of people ages 21 to 34 conduct the majority of their banking via the Internet, and approximately 40 percent of Americans ages 45 to 69 are now doing most or all of their banking online too. The findings from HSBC Direct align with projections about the future for online banking from Forrester Research that indicates 92 million or 76 percent of American households are expected to be banking online by 2011.

77.     In fact, for years advertisers have been willing to pay premium rates to Bank Rate Websites in order to reach "in-market" consumers at the expense of other sites and media, as acknowledged by BANKRATE in its 2003 Corporate Profile.

---

[13] *See, e.g.,* The Death and Life of the American Newspaper, by Eric Alterman, *The New Yorker*, March 31, 2008.

78.     Comparing Bank Rate Websites to web search engines such as Google is like comparing "apples to oranges." In other words, they are not comparable or reasonably interchangeable. In its Q3-07 Earnings Call, BANKRATE's President and CEO, Evans, stated as follows, in response to a question about the pricing differences:

> Somebody types in mortgage rates on Google and clicks, and the top guy is willing to spend 12, 13 bucks or whatever it happens to be, and it bounces around a lot depending upon who is in their bidding.

> Compare that person who just clicked on mortgage rates to a person who has come to Bankrate, who has gone onto our mortgage channel, who is logged in, 30-year fixed, $300,000 or whatever the number happens to be, Arizona, Phoenix, goes down and looks at the 37 lenders on that table and clicks on ABC Mortgage of Phoenix. I mean, it is a very different person, who is a very different sort of way down the funnel. I just think it works different than Google does.

> Again, not comparing Bankrate to Google, but if you are talking about pricing, I think it really is apples and oranges.

79.     According to BANKRATE, Bank Rate Websites are "10 times better" than other sites, and are therefore not reasonably interchangeable with other types of websites. For example, in BANKRATE's Q3-07 Earnings Call, Evans made the following statement:

> I'll be honest with you. When we go out, Bankrate is premium-priced to other sites. There is a reason for that. If we generate a higher click-through rate, if we generate a higher conversion rate, it is going to cost more money.

> If we are 10 times better click-through and conversion than a site that is selling for $7 CPMs, we should be selling for $70. There is also an ability of advertisers to know that they are going to get a consistent number of clicks, and that the

demography, if you will, of those consumers is going to be relatively consistent as well.

**D.**    <u>Inelasticity of Demand</u>**: Virtually No Demand for Substitute Products in Response to Significant Consecutive Price Changes**

80.    No other substitute products or markets have constrained Bank Rate Website CPC price increases. For example when BANKRATE together with the CARTEL raise their CPC prices, purchasers are not finding alternatives and have nowhere else to go.

81.    Upon information and belief, BANKRATE's Bank Rate Website revenues grew at a rapid pace, particularly from 2005 to 2008—despite six or more consecutive, significant, and non-transitory increases in CPC price—each time by 10 to 25 percent, clearly proving that cross-elasticity of demand is currently either non-existent or extremely low. For example, at BANKRATE's Q3-07 Earnings Call, Evans acknowledged the following:

> As I said, I was looking at this e-mail from one of our lenders who said if—his last line is, if lenders aren't making money off Bankrate, then they are doing something wrong.
>
> And some people have better business models and obviously better at converting than others, but because of that, *we are pretty confident about our ability to push rates*. And again, nobody calls us and goes, hey, thanks for the rate increase, can I have another?
>
> *But the fact is that they don't vote with their feet. They don't leave. They are not canceling. They are not finding alternatives.* We think we are a fair value. We think we are in some cases under priced relative to the value. And we think that that -- we will try to reconcile that and rectify that over time. (Emphasis added.)

82.     Thus, BANKRATE's repeated public admissions confirm the current inelasticity of demand and insensitivity to price increases of Bank Rate Websites.

83.     Within a year of introducing a CPC pricing structure on October 1, 2005, after destroying the competition, BANKRATE started recouping monopoly profits by pushing through three successive rate increases across the board to all of its CPC advertisers on all channels, including a 20% rate increase on October 1, 2006.  Despite these rate increases, BANKRATE  and the CARTEL experienced no decline in the number of customers wanting to list rates on a CPC basis on their Bank Rate Websites.

84.     The first year's results of the BANKRATE's CPC strategy and price increases was confirmed by Evans during BANKRATE's Q3-06 Earnings Call, as follows:

> I probably don't need to tell you that the hyperlink business has been a home run for us and continues to go very well; up 58% in this quarter versus a year ago.  Last October 1, a year ago, we launched cost per click pricing from the old flat model.  I could spend a lot of time on this but I think its success could be summed up in three statistics:
>
> Number One:  We have more lenders today on our rate tables then we did a year ago when we launched cost per click.
>
> Number Two:  44% of the revenue from our CPC tables in Q3 came from the deposits channel, and that compares to 21% a year ago and just 12% two years ago in the same quarter.
>
> Number Three: On October 1st we pushed through a 20% rate increase across the board to all of our CPC advertisers on all channels and saw no decline in the number of advertisers wanting to participate.

> One last interesting statistic on CPC; while mortgage revenue declined as a percent of revenue on our rate tables in Q3 from 66% in 2005 to 46% in this year, actual dollars from mortgage clicks were up 20% versus last year. So CPC is humming and working extremely well for us.

85.    On February 6, 2007, during BANKRATE's Q4-06 Earnings Call, Evans reported three rate increases throughout the year, in January, July and October:

> We continue to be pleased with the consumer and advertiser interest in our rate tables and continue to see the strength from both the mortgage and deposit business with the number of advertisers on our tables continuing to grow. Cost-per-click revenue was up 62% for the quarter and 68% for the year. Interestingly, in the fourth quarter, both mortgage and deposit click volume increased from the prior year and that growth combined with our rate increase had an obvious positive impact on CPC revenue. During the year our Hyperlink business showed amazing strength in both volume levels and in pricing power throughout the year, exhibited by rate increases in January, July and October.

86.    On June 11, 2007, BANKRATE and the CARTEL implemented a 15% price increase across the board on their CPC Program Pricing, effective as of July 1, 2007.

87.    On August 2, 2007, during BANKRATE's Q2-07 Earnings Call, Evans, acknowledged the following:

> While we don't want to be either arrogant or naive, *the fact is we really haven't seen any exodus of advertisers. In fact, it's been just the opposit*e. We continue to grow our rate table-advertising base and have more lenders on the table than we did last quarter, and more than we had last year.
>
> Hyperlink revenue for the quarter, as Ed said, was up 31%, while *the number of advertisers on our rate tables continue to grow for the seventh straight quarter as more and more advertisers are finding the Bankrate tables the go-to place for reaching end market consumers who click and convert.*

26

As of yesterday, August 1, we had 811 advertisers on our rate tables. Given that strength, given that demand, you are aware that we previously announced a 15% price increase for mortgage and home equity hyperlink clicks effective July 1. As Ed said, there's more news on the pricing front. This last week we announced to deposit advertisers a price increase effective August 15 of 25% per CD click, and 20% per money market click.

*Again, the increases are driven by advertiser demand and our belief that Bankrate provides a unique environment that advertisers find very valuable. And you should know that neither increase has resulted in a decline in the number of advertisers."*

88.    On November 2, 2007, during BANKRATE's Q3-07 Earnings Call, Evans, again acknowledged the following:

On July 1st, we implemented a 15% CPC price increase for mortgage, home equity and other debt-related products. On August 15th, we implemented a 25% CPC price increase for CDs and a 20% price increase for money market accounts. The level of demand for these products continues to be very high. We now have over 800 CPC advertisers on the tables with demand continuing to grow every day.

89.    On February 5, 2008, during BANKRATE's Q4-07 Earnings Call, DiMaria, again acknowledged the following:

We opened our 2008 CPC rate search business with a 20% increase for deposit clicks effective January 1st, 2008. Cost per click or CPC rate search revenue came in at $10.3 million in Q4 2007, compared to $7.4 million in Q4 2006, representing an increase of 39%. The increase was achieved through more CPC clicks, as well as higher CPC rates. As I mentioned, CPC proved to be solid all year long, with CPC revenues for the full fiscal year coming in at $36.9 million, a $10.2 million, or at 38% increase over the $26.7 million we posted for fiscal 2006.

90.     During that same February 5, 2008 Earnings Call, Evans added the following, which provides further evidence of the relevant market's current inelasticity of demand and insensitivity to price increases:

> I can tell you, in fact, that January of 2008, is the best month we've had in the history of the company. We've had the highest unique visitors, the highest page views, the highest CPC revenue, the highest display revenue and the best month we've ever had for Bankrate Select, and I'm talking about apples-to-apples, just Bankrate, not including any of the revenue from NCS, the credit card lead-gen company or Savingforcollege, both of which we acquired in December. I'm speaking of just Bankrate.
>
> And just to give you a sense, January traffic was more than 50% above the best month we've ever had, and 70% above last January. CPC revenue for January was more than 50% above November, the best CPC month we've ever had, and more than doubled last January CPC revenue.

91.     On May 3, 2008, during BANKRATE''s Q1-08 Earnings Call, when asked about the number of CPC advertisers in the first quarter of 2008, Evans further acknowledged the following:

> We had well over a thousand CPC advertisers and I know the last year's number was 60 to 75 Display advertisers, end of quarter.

92.     On August 4, 2008, during BANKRATE''s Q2-08 Earnings Call, yet another 20% CPC price increase was announced. DiMaria stated as follows:

> The hyperlink business increased by 30% from $8.2 million in Q2 2007 to $10.7 million in Q2 2008 …. The increase in revenue this quarter was driven by an increase in volume and higher CPC prices. Also, please note that we further increased our money market CPC rates by 15% and our CD CPC rates by 20% effective July 1st.

93.    During this same Q2 2008 Earnings Call, Evans added the following comments:

> As I mentioned, July's traffic was strong. We've seen even greater interest in deposits. You'll remember that as Ed mentioned, we increased CPC prices for CDs by 20% and MMAs by 15% effective July 1st, so that's had a positive impact. In fact, as a result CPC revenue for July was up over 60% above July of 2007.

94.    Evans then reiterated the following:

> I talk to our sales guys all the time. We talk to our managers. We go out and see customers. *Nobody said to us guys, we're not using you because we got a great deal from somebody, or we're not using you guys, we're not running what we can because you guys are priced too high.*
>
> *So we really don't feel like we are losing to other sites. We really don't feel like we are getting pressure on price.*

95.    Then, in response to a question about how well the BANKRATE rate tables were populated, Evans answered:

> In deposits, it's rocking. I mean, it's -- the demand is very, very high. *The consumer interest is high and we pushed through, as I said, a 20% price increase without a peep. I mean, really without any push-back at all from our customers.*

96.    Finally, BANKRATE's CEO's own statements at its Q4-08 Earnings Call, best describe the inelasticity of demand for Bank Rate Websites in the midst of the worst economic crisis faced by banks, mortgage brokers and lenders, its financial community customers:

> As for traffic, page views at 164 million were up 26% for the quarter and at 687 million were up 24% for the year. While unique visitors at 19 million for the quarter was up 26% and we generated 72 million unique visitors for the year.

I think there's an important point we don't want to gloss over. In the worst economic environment for the financial community, our traffic and visitor base, both grew in excess of 20%.

97.    Therefore, regardless of BANKRATE's and the CARTEL's frequent price increases, customer demand for other sites and media is inelastic, "they are not canceling … They are not finding alternatives."[14]

98.    Hence, while there may have been other interchangeable products in the past, as a result of the concerted illegal conduct of Defendants, BANKRATE and the CARTEL, customer demand for Bank Rate Website CPC rate listings in the United States is now inelastic.

## THE ANTICOMPETITIVE SCHEME

99.    Upon information and belief, Defendants knew and agreed to act in concert with BANKRATE and in conjunction with the CARTEL, possessing combined market power in the market for Bank Rate Websites with an approximately 95% market share (i) have divided markets and allocated customers, traffic and revenues with competitors, (ii) have fixed prices and exchanged information with competitors, (iii) in parallel, by agreement and concerted action rather than independent action, (iv) acting in a uniform manner, (v) have severely limited and unlawfully impeded competition in the market for Bank Rate Websites, (vi) have injured and adversely affected Plaintiff

---

[14] BANKRATE's Q3-07 Earnings Call, quoting Evans.

and competition in the relevant market, as well as consumers, and financial service providers as a proximate result of their concerted action.

100.   More specifically, upon information and belief, Defendants have acquiesced and agreed to let BANKRATE sell Bank Rate Website Hyperlinks on behalf of itself and the members of the CARTEL at CPC prices they knew to be fixed pursuant to the conspiracy described above; concealed the existence of the conspiracy from consumers and other market participants to allow the continuation of the conspiracy; and exchanged sensitive competitive information on sales, consumer clicks and revenue for the purpose of monitoring adherence to the agreed-upon CPC prices and revenue shares.

101.   Upon information and belief, Defendants have acquiesced to let BANKRATE and the CARTEL members jointly charge financial institutions for each instance where a consumer clicks on a hyperlink for a financial institution listed in a rate table. Furthermore, the CPC price charged was the same across the CARTEL's entire network of Bank Rate Websites, including Defendants' controlled websites *Bankrate.com*, *Interest.com* and *Bankaholic.com*.

102.   Moreover, upon information and belief, Defendants have acquiesced to let BANKRATE act as the exclusive nationwide selling agent of CPC rate table listing for the competing Bank Rate Websites of all members of the CARTEL.

103.   Defendants knew or should have known that BANKRATE repeatedly described the other members of the CARTEL as its partners and competitors in its

periodic S.E.C. filings. In fact, during BANKRATE's Q2-07 Earnings Call Evans acknowledged the following:

> **"Some of the guys that are our partners, they're also competitors."**

104.    Defendants knew or should have known that the members of the CARTEL compete with each other and with Defendants' controlled websites *Bankrate.com*, *Interest.com* and *Bankaholic.com* for revenue and Internet consumer traffic in the market for Bank Rate Websites or in other markets, and they each were or are actual or potential competitors of Plaintiff in the market for Bank Rate Websites. See Exhibit C annexed hereto.

105.    As stated in BANKRATE's Form 10-K for 2007:

> Competition in the online publishing segment is generally directed at growing users and revenue, using marketing and promotion to increase traffic to websites.

106.    Upon information and belief, Defendants knew or should have known that CPC revenues were shared approximately on a 50-50 basis between BANKRATE and the members of the CARTEL, as explicitly acknowledged by Evans during Q2-06 and Q4-06 Earnings Call Question-and-Answer Sessions, respectively, as follows:

> **BANKRATE Q2 2006 Earnings Call** (August 2, 2006):
>
> **Gary Schnierow - JP Morgan:**
>
> *Okay and what's the traffic you get from your partners? How does the revenue split on that work?*
>
> **Thomas R. Evans:**

> *Yes, generally it goes to those co-brands and we split the revenues 50-50.*

> **BANKRATE Q4 2006 Earnings Call** (February 6, 2007):

> **Thomas R. Evans:**

> *Well, most of you know when we talk about our partner traffic, I mean the traffic costs us nothing, but we do rev share with our partners basically 50-50.*

107.   The following alternative scenarios best describe the dynamics of horizontal competition and revenue sharing between Defendants' controlled websites *Bankrate.com*, *Interest.com* and *Bankaholic.com* and the other members of the CARTEL in the market for Bank Rate Websites.

108.   <u>Scenario A</u>: If a consumer visits the *Bankrate-dot-com* website directly and clicks on a listed financial service provider's CPC Hyperlink, then BANKRATE earns 100% of the CPC revenue, while the competing Bank Rate Websites of the other members of the CARTEL earn nothing.

109.   <u>Scenario B</u>: On the other hand, if a consumer visits a Bank Rate Website of one of the other members of the CARTEL, then that member of the CARTEL earns 50% of the CPC revenue, while BANKRATE earns only 50% of the revenue balance. The other members of the CARTEL still earn nothing.

110.   Figure 2 of Exhibit A annexed hereto, provides an illustration of the CARTEL's centralized sales office and competing Bank Rate Websites operating at the same horizontal level of market structure as *Bankrate.com, Interest.com, Bankaholic.com*

and *BanxQuote.com*, to which Defendants at best acquiesced and at worst intentionally perpetuated.

111.    In fact, cooperation among competitors and horizontal restraints are not essential for Bank Rate Websites to be able to operate. In other words, it cannot be said that an agreement on prices is necessary to market Bank Rate Websites at all.

112.    Since the intent or predominant effect of Defendants' conduct was to prevent *independent* competition among the individual Bank Rate Websites of the other members of the CARTEL with *Bankrate.com, Interest.com,* and *Bankaholic.com* at the same level of market structure, the restraint of trade is unambiguously horizontal in nature and effect.

113.    Defendants knew or should have known that the joint venture partnership agreements between BANKRATE and the members of the CARTEL are anticompetitive regardless of whether the parties divided a market within which both conduct business or whether they merely reserved one market for one, and another for the other.

114.    In BANKRATE's Q1-07 Earnings Call, Evans provided a stunning acknowledgement of the CARTEL's strategic preclusion and foreclosure of competition as follows:

> *One of the things that is a tremendous gating item for us, we believe is in terms of competition, and barriers for competition, is how does anybody else break into this, if we have tied up all the best newspaper relations, the best co-brand relationships and we've got a dynamic organic traffic website.*
>
> *How does anybody else get into this business and compete with Bankrate? I look at it as both an offensive marketing opportunity, as well as a defensive opportunity.*

115.    Defendants acting in concert with BANKRATE and the other members of its CARTEL have therefore *jointly* created insurmountable competitive restraints and barriers to entry, and committed unlawful, antitrust violations.

116.    Such restraints on competition were not essential for Bank Rate Websites to function. None of these restraints on competition were necessary to market Bank Rate Websites and there was no absolute necessity for Defendants to cooperate through concerted activity with BANKRATE and the CARTEL to market Bank Rate Websites, to divide markets and allocate customers, or to charge the same CPC fixed prices.

117.    Furthermore, these practices have neither promoted technological innovation, enhanced efficiency, nor benefited consumers, and were intended to foreclose and/or had the effect of foreclosing competition.[15]

## THE ANTICOMPETITIVE EFFECTS

118.    Upon information and belief, Defendants and BANKRATE have achieved a total relevant market share of approximately 95%, thereby possessing undeniable

---

[15] In the Bankrate Action this Court ruled that BanxCorp cited to sufficient evidence to show that its allegations of horizontal competition are at least plausible, and that BANKRATE's market share, monopoly power, and antitrust injury were adequately plead.  With respect to market division and customer allocation agreements, BanxCorp has presented enough factual matter to support the contention that agreements were made and that discovery may reveal evidence of illegality. For example, BanxCorp has adequately pled claims for an illegal agreement in restraint of trade as a result of the Lending Tree agreements. Regarding the alleged price-fixing agreements with competitors, BanxCorp provided sufficient factual content to allow the Court to draw a reasonable inference of liability for the misconduct alleged.

market power as a result of its unlawful antitrust violations and anticompetitive conduct.

119.    Upon information and belief, no viable independent competitor is still functioning as a Bank Rate Website with a market share over 5%.

120.    Furthermore, the infrastructure required to compete with Defendants, BANKRATE, and the CARTEL is extremely expensive to build and it is therefore unlikely that a new entrant will be able to realistically compete and penetrate this market while such exclusionary and predatory monopoly remains in operation.

121.    Upon information and belief, based on their current growth rate and overall market trends, Defendants and BANKRATE are imminently expected to achieve a 99-100% total market share in the market for Bank Rate Websites.

122.    Upon information and belief, Defendants' and BANKRATE's exclusionary conduct have effectively and unlawfully precluded Plaintiff and other competitors from the market for Bank Rate Websites.

123.    Plaintiff's market share, going concern and fair market values have been destroyed as a result of Defendants' and BANKRATE's unlawful anticompetitive conduct.

124.    But for Defendants' and BANKRATE's acts, Plaintiff and others would be able to compete based on competitive merit, bringing lower prices to financial service providers, enhanced technological innovation and greater freedom of choice to both financial service providers and consumers.

125.    Defendants' anticompetitive acts had a direct, substantial, and negative effect on trade and commerce, by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient economic scale.

126.    The most significant harm to Plaintiff, consumers, financial service providers, and competition is as follows:

a.  Independent Bank Rate Websites were previously competing for customers primarily on the basis of price, but as a result of Defendants' conspiracy with BANKRATE, financial service providers lost their principal bargaining power.

b.  BANKRATE's periodic CPC price increases, charged to over a thousand participating financial service providers, directly affected and raised each bank's acquisition cost per account and non-interest expense.

c.  Banks were inevitably forced to pass on these higher expenses to consumers who visit BANKRATE's Bank Rate Websites, by offering them less favorable interest rates, above or below the rates that likely would prevail in the absence of such cartel, as a result of this umbrella effect.

d.  Defendants' have made it virtually impossible for competing Bank Rate Websites to remain in business or become newly established.

e.  Defendants' and BANKRATE's exclusionary conduct successfully foreclosed and forecloses future entry, prevents or limits rivals from

gaining competitive access to potential co-branding partners or customers, and excludes rivals from a significant part of the relevant market.

f.  Too much sharing and exchanging of instantly available information by BANKRATE and its competitors facilitated market division, customer allocation and price fixing through coordination mechanisms, to the detriment of consumers, financial service providers and any independent competitors everywhere, including Plaintiff.

g.  BANKRATE's monopoly reduced Defendants' ability or incentive to compete independently, limited independent decision making, and combined the control of or financial interests in production, key assets, or decisions regarding price, input, output, or other competitively sensitive variables.

h.  Defendants knew or should have known that BANKRATE's CARTEL's formation resulted in an increase of CPC prices more than six consecutive times, each time by 10% to 25%, since October 1, 2005.

i.  The ability or incentive to reduce or increase input, output, quality, service, and/or technological innovation above or below what likely would prevail in the absence of Defendants' and BANKRATE's anticompetitive conduct, caused detriment to consumers, financial service providers and competitors in the relevant geographical market.

j.  Defendants' concerted action with BANKRATE which collaborated with competitors who are members of the CARTEL facilitated explicit or tacit collusion through practices such as the exchange or disclosure of competitively sensitive information or through increased market concentration.

k.  Such collusion by Defendants involved the market for Bank Rate Websites in which Defendants are actual or potential competitors.

l.  Defendants' concerted action with BANKRATE precluded rivals from obtaining the necessary scale needed for efficient or viable levels of operation, raised rivals' operating and marketing costs, inhibited competition and induced competitors' exit.

m.  BANKRATE's exclusionary practices and monopoly power have been unlawfully used by Defendants as leverage to gain market share, preclude competition, and potentially extend their dominance beyond the U.S. relevant market.

n.  Defendants' anticompetitive actions have therefore led to the following:

   i.      fixed Bank Rate Websites CPC prices

   ii.     less favorable consumer interest rates

   iii.    less technological innovation

   iv.     less choice

   v.      greater threat to our free market system

vi.   less accountability

vii.   more limited checks and balances

viii.   less protection against price fixing

ix.   less protection against market divisions or customer allocations

x.   greater risks of market manipulation

xi.   less fairness

xii.   less transparency

xiii.   less privacy

xiv.   less service

127.   More specific effects of Defendants' acquiescence and price-fixing conspiracy with BANKRATE are as follows:

a.   Several independent pricing voices became a single monopoly pricing voice.

b.   A central sales force was responsible for coordinating pricing, sales, collections and disbursement of respective revenue shares, for the mutual benefit of each member of the CARTEL.

c.   There was a common target price, the CPC.

d.   All sales adhered to a price list or rate card.

e.   Price differentials between different types, sizes, locations, or quantities of products were maintained uniformly.

f.   Payment and credit terms were standardized.

g.   Allowances, discounts and markups were uniformly established.

    h.  Input or output were coordinated and purposefully reduced or expanded in order to affect prices.

    i.  The price list was not publicly available, another tell-tale sign of price fixing, discrimination and manipulation.

128.   Defendants' antitrust violations have caused substantial harm to Plaintiff's business, as follows:

    a.  Loss of Market Share and Revenues.

    b.  Higher Operating and Marketing Expenses.

    c.  Lost Profits.

    d.  Increased Costs of Capital and No Access to Capital Markets.

    e.  Severely Contracted Operating Scale, required for Plaintiff to maintain a viable level of operation.

    f.  No Longer Viable as a Going Concern, unless Plaintiff's private owner continues to personally finance its unprofitable operations.

129.   The negative consequences of the disappearance of Plaintiff as a competitor are substantial, not only to Plaintiff, but to all marketplace participants, consumers and financial service providers as a whole.

130.   Defendants have adversely affected over 72 million American consumers online, as well as thousands of banks, mortgage brokers, and lenders, by depriving them of the benefits of an open and competitive free market system (and more competitive interest rates and prices).

131.   If the operation of Bank Rate Websites throughout the United States is exclusively controlled by Defendants, the opportunities for market manipulation and abuse of market power increase tremendously, with potentially catastrophic consequences for the entire United States consumer banking, mortgage and credit markets, and any other related markets, as well as the Nation's economy.

132.   The adverse anticompetitive effects of Defendants' actions are particularly ominous in light of the prolonged financial, mortgage and credit crisis.

## ANTITRUST STANDING

133.   BANXCORP is a proper party to seek redress under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, because it is a competitor in the relevant market, which has been restrained and monopolized, and BANXCORP has suffered direct injury therefrom.

134.   There is a direct, causal relationship between the challenged conduct and BANXCORP's injuries, and those injuries are neither tenuous nor speculative.  Absent Defendants' and BANKRATE's illegal anticompetitive scheme to restrain trade, BANXCORP could have increased its size, profitability, market share and market value instead of being driven out of the market by unlawful, anticompetitive conduct.

## PUBLIC RECORDS AND DOCUMENTS INCORPORATED BY REFERENCE

135.   In addition to the judicial proceedings, Court Opinions. pleadings, briefs and exhibits pertaining to the related Bankrate Action and LendingTree Action as set

forth above, the following public records and documents are incorporated into this complaint by reference:

a.   All public filings made by BANKRATE and the Bankrate Insiders with the S.E.C. from March 11, 1999 until October 5, 2009.

b.   All public filings made with the S.E.C. by each of the Defendants, each of the International Cartel members, and Messrs. Harpreet Anand, Seth Brody, Philipp Gusinde, Sean Fernandes, Christian Stahl, Mitch Truwit and John F. Megrue with respect to their BANKRATE-related transactions in 2009.

c.   All files, website pages and historical archives or cashed pages of BANKRATE available at *bankrate.com*, *pr.bankrate.com*, *investor.bankrate.com*, *bankrateselect.com*, *interest.com* and *bankaholic.com*, from 1999 to the present.

d.   All files, website pages and historical archives of Apax Partners available at *apax.com* from July 1, 2009 to the present.

e.   All publicly available press releases of BANKRATE from 1999 to the present.

f.   All files, website pages, historical archives and cached pages pertaining to the Bank Rate Websites of BANKRATE's approximately 100 co-branding partners, from 1999 to the present.

g.   Transcripts of Bankrate Inc. (RATE) quarterly earnings calls from Q3-2005 through Q2-2009 publicly available at the following website: *http://seekingalpha.com/symbol/rate/transcripts*.

h.   Agreement and Plan of Merger dated November 20, 2005, by and among Bankrate, Inc., Sub 1, Sub 2, Mortgage Market Information Services, Inc. and Interest.com, Inc., Scarlett Enterprises, Ltd., and James R. De Both, as filed by BANKRATE with the S.E.C. on Form 8-K on or about November 30, 2005: http://sec.gov/Archives/edgar/data/1080866/000114420405038881/v030993_ex10-2.htm.

i.   Asset Purchase Agreement (in connection with Bankaholic acquisition) effective as of September 23, 2008 by and among Bankrate, Inc., Blackshore Properties, Inc. and Johns Wu, as filed by BANKRATE with the S.E.C. on Form 10-Q, Exhibit 2.2, on or about November 10, 2008: http://sec.gov/Archives/edgar/data/1080866/000119312508231126/dex22.htm.

**EFFECT ON INTERSTATE COMMERCE**

136.   Defendants' anticompetitive conduct as alleged herein has taken place in interstate commerce among the States and in the market for Bank Rate Websites.

## FIRST CLAIM FOR RELIEF
### (SHERMAN ACT, SECT. 1, 15 U.S.C. § 1)
### CONTRACT, COMBINATION OR CONSPIRACY IN RESTRAINT OF TRADE

137.   Plaintiff incorporates all previous paragraphs herein by reference.

138.   Upon information and belief, Defendants entered into a contract, combination or conspiracy in restraint of trade to achieve monopoly power, fix prices, divide markets and allocate customers, traffic and revenues with competitors in the market for Bank Rate Websites throughout the United States, by acquiring and operating BANKRATE, which has achieved monopoly power in the relevant market with a market share equal to or greater than 95%.

139.   Upon information and belief, Defendants' anticompetitive conduct had a significant adverse effect on competition in the market for Bank Rate Websites, causing direct and proximate harm to Plaintiff, other remaining independent competitors, customers – the financial service providers, and to consumers – the end users.

140.   The anticompetitive actions of Defendants have injured Plaintiff in its business and property and its injuries and damages are ongoing.

## SECOND CLAIM FOR RELIEF
### (SHERMAN ACT, SECT. 2, 15 U.S.C. § 2)
### MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION

141.   Plaintiff incorporates all previous paragraphs herein by reference.

142.   Upon information and belief, Defendants had both the power to monopolize and the intent to monopolize the market for Bank Rate Websites. Furthermore, upon information and belief, BANKRATE possesses monopoly power in

the relevant market, and Defendants willfully acquired and maintained that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

143. Defendants are maintaining and extending their monopoly power through the predatory and exclusionary conduct described above, and are attempting to further monopolize the market for Bank Rate Websites, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

144. Substantial barriers to entry exist in the relevant market and there is no legitimate business justification for Defendants' monopolization and attempted monopolization conduct.

145. Defendant's anticompetitive conduct has had a significant adverse effect on competition in the market for Bank Rate Websites, causing direct and proximate harm to Plaintiff, other remaining independent competitors, customers – the financial service providers, and to consumers – the end users.

146. The anticompetitive actions of Defendant have directly injured Plaintiff in its business and property and its injuries and damages are ongoing.

### THIRD CLAIM FOR RELIEF
### (CLAYTON ACT, SECT. 7, 15 U.S.C. § 15)
### PROHIBITED MERGERS AND ACQUISITIONS

147. Plaintiff incorporates all previous paragraphs herein by reference.

148. Defendants entered into a contract, combination or conspiracy in restraint of trade to acquire BANKRATE, which upon information and belief, has achieved

monopoly power in the relevant market with a market share equal to or greater than 95%.

149.    The acquisition substantially lessened competition or tended to create a monopoly in the relevant market, in violation of Section 7 of the Clayton Act.

150.    The effect of Defendants' acquisition of BANKRATE was to decrease competition in the market for Bank Rate Websites, while also causing direct and proximate harm to Plaintiff, other remaining independent competitors, customers – the financial service providers, and to consumers – the end users.

151.    The anticompetitive acquisition has directly injured Plaintiff in its business and property and its injuries and damages are ongoing.

### FOURTH CLAIM FOR RELIEF
### (NEW JERSEY ANTITRUST ACT, N.J STAT. ANN. § 56:9-1 *ET SEQ.*)
### CONTRACTS AND COMBINATIONS IN RESTRAINT OF TRADE

152.    Plaintiff incorporates all previous paragraphs herein by reference.

153.    Upon information and belief, Defendants entered into a contract, combination or conspiracy in restraint of trade to achieve monopoly power, fix prices, divide markets and allocate customers, traffic and revenues with competitors in the market for Bank Rate Websites throughout the United States, by acquiring and operating BANKRATE, which has achieved monopoly power in the relevant market with a market share equal to or greater than 95%, in violation of Section 56:9-3.

154.    Upon information and belief, Defendants had both the power to monopolize and the intent to monopolize the market for Bank Rate Websites.

Furthermore, upon information and belief, BANKRATE possesses monopoly power in the relevant market, and Defendants willfully acquired and maintained that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident, in violation of Section 56:9-3.

155.   Defendants are maintaining and extending their monopoly power through the predatory and exclusionary conduct described above, and are attempting to further monopolize the market for Bank Rate Websites, in violation of Section 56:9-3.

156.   Defendants entered into a contract, combination or conspiracy in restraint of trade to acquire BANKRATE, and the acquisition substantially lessened competition or tended to create a monopoly in the relevant market, in violation of Section 56:9-3.

157.   Defendants' anticompetitive conduct had a significant adverse effect on competition in the market for Bank Rate Websites, causing direct and proximate harm to Plaintiff, other remaining independent competitors, customers – the financial service providers, and to consumers – the end users.

158.   The anticompetitive actions of Defendants have directly injured Plaintiff in its business and property, as more fully described above and its injuries and damages are ongoing.

## PRAYER FOR RELIEF

**WHEREFORE**, based on the foregoing, Plaintiff BANXCORP respectfully requests that this Court:

a.  Issue a declaratory judgment that Defendants have violated Section 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, and the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-1 *et seq*;

b.  Grant injunctive relief, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 56:9-10 of the New Jersey Antitrust Act, prohibiting Defendants and all persons, firms, and corporations acting on their behalf, or under their direction or control, from engaging in any further conduct unlawful under Section 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, and under the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-1 *et seq*;

c.  Award Plaintiff damages in an amount to be proven at trial, to be trebled as provided by statute;

d.  Award Plaintiff the costs of this action, including attorneys' fees; and

e.  Grant any other relief as the Court deems just and proper.

Dated: Newark, New Jersey
         September 16, 2010

Respectfully submitted,

s/ *Nelson E. Canter*
Nelson E. Canter, Esq.
CANTER LAW FIRM P.C.
*Attorneys for Plaintiff*
123 Main Street – 9th Floor
White Plains, New York 10601
(914) 948-3011
ncanter@canterlawfirm.com